# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| PETER KOMASSA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| PETER GALLAGHER; PATRICK | ) |
| GOTTSCHLICHT; STEPHEN M. | ) |
| REILLY, JR.; GPM II, LLC; I.N.S.A., INC.;) |  |
| INSA, LLC; and KALYX, LLC, | ) |
| | ) |
| Defendants, | ) |
| | ) |
| GREEN PARK MANAGEMENT ALPHA, ) |  |
| LLC; GREEN PARK MANAGEMENT, | ) |
| INC.; GPM INVESTMENT, LLC, | ) |
| | ) |
| Nominal Defendants. | ) |
| _____ | ) |

Civil Action No.: 3:20-cv-10360

**LEAVE TO FILE GRANTED ON
JANUARY 5, 2022 (ECF NO. 99)**

## AMENDED SUPPLEMENTAL CIVIL COMPLAINT

Plaintiff Peter Komassa ("Mr. Komassa" or "Plaintiff"), his Complaint against

Defendants Peter Gallagher ("Mr. Gallagher"), Patrick Gottschlicht ("Mr. Gottschlicht"),

Stephen M. Reilly, Jr., Esq. ("Attorney Reilly"), GPM II, LLC ("GPM II, LLC"), I.N.S.A., Inc.

("I.N.S.A., Inc."), INSA, LLC ("INSA, LLC"), and Kalyx, LLC ("Kalyx") (together the

"Defendants"), and Nominal Defendants Green Park Management Alpha, LLC ("GPM Alpha"),

Green Park Management, Inc. ("GPM, Inc."), and GPM Investment, LLC ("GPM Investment"),

upon personal knowledge with respect to him and his own acts, upon information and belief as to

all other matters, and with the belief that all matters alleged herein are likely to have evidentiary

support after a reasonable opportunity for further investigation and discovery, states as follows:

## INTRODUCTION

1.      Mr. Komassa brings this action to redress Defendants' improper denial of his rights under a partnership that he formed with Mr. Gallagher, Mr. Gottschlicht, and Attorney Reilly, and in their usurping the fruits of Mr. Komassa's knowledge and expertise for their exclusive personal gains and ends.

2.      Mr. Gallagher induced Mr. Komassa to expend a significant amount of time, effort, and resources, and to put his reputation at risk, in furtherance of the partnership's goals, only to purport to oust Mr. Komassa from the partnership and deny him his right to share in the profits and losses of the partnership's ventures.

3.      Meanwhile, Mr. Gottschlicht and Attorney Reilly stood by and, upon information and belief, supported and encouraged Mr. Gallagher's ouster of Mr. Komassa, despite their fiduciary duties to their partner, Mr. Komassa.

4.      Mr. Komassa brings his claims for: (i) breach of contract, (ii) breach of the implied covenant of good faith and fair dealing, (iii) breach of fiduciary duty, (iv) *quantum meruit*, (v) promissory estoppel, (vi) unjust enrichment, (vii) conversion, (viii) fraud, (ix) unfair and deceptive acts and practices, and (x) a declaration of his right regarding Mr. Gallagher's spoliation of material evidence.

5.      In particular, promptly after purporting to oust Mr. Komassa from the partnership, Mr. Gallagher deleted Mr. Komassa's e-mail account, which contained material and irrefutable documentary evidence of the partnership alleged herein, Mr. Komassa's extensive sweat equity, and the significant value that Mr. Komassa contributed to the partnership and the ventures it pursued.

6.      Upon information and belief, Mr. Gallagher deleted this data intentionally to attempt to avoid being held to account for his acts and omissions.

7.      Mr. Komassa also seeks injunctive relief in requiring Defendants to honor Mr. Komassa's financial interest and stake in all partnership ventures, as Mr. Komassa otherwise lacks an adequate remedy at law.

## PARTIES

8.      Plaintiff is an adult individual and a citizen of the State of Texas.

9.      Defendant Peter Gallagher is an adult individual who is believed to be a citizen of the State of New York.

10.      Defendant Patrick Gottschlicht is an adult individual who is believed to be a citizen of the Commonwealth of Massachusetts.

11.      Defendant Stephen M. Reilly, Jr., is an adult individual who is believed to be a citizen of the Commonwealth of Massachusetts, with an office in Springfield, Massachusetts.

12.      Defendant I.N.S.A., Inc., is a Massachusetts corporation, with its principal place of business located at 122 Pleasant Street, Easthampton, MA 01027.

13.      Defendant GPM II, LLC, is a Delaware limited liability company.  Upon information and belief, GPM II, LLC, has its principal place of business located at 122 Pleasant Street, Suite 144, Easthampton, MA 01027.

14.      Defendant INSA, LLC, is a Pennsylvania limited liability company, with its principal place of business located at 2384 N. Old Trial Road, Shamokin Dam, PA 17876.

15.      Defendant Kalyx, LLC, is a Massachusetts limited liability company, with its principal place of business located at 281 State Street, Springfield, MA 01103.

16.     Defendant Green Park Management Alpha, LLC, is a Delaware limited liability company.  Upon information and belief, GPM Alpha has been dissolved.

17.     Defendant Green Park Management, Inc., is a Delaware corporation.  Upon information and belief, GPM, Inc., has been dissolved.

18.     Defendant GPM Investment, LLC, is a Delaware limited liability company.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 and may exercise supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.  There is complete diversity among the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

20.     This Court has personal jurisdiction over Mr. Gottschlicht and Attorney Reilly because they are citizens of the Commonwealth of Massachusetts.

21.      This Court has personal jurisdiction over Mr. Gallagher because he transacts business in the Commonwealth of Massachusetts, including in connection with the acts and omissions described below and as the Registered Agent of I.N.S.A., Inc., a Massachusetts corporation, as well as its current President, Treasurer, Secretary, Chief Financial Officer, and Director.  Mr. Gallagher also transacts business in the Commonwealth of Massachusetts, including as described below.

22.     This Court has personal jurisdiction over GPM II, LLC; GPM, Inc.; INSA, LLC; and Kalyx.  GPM II, LLC, and Kalyx are registered to do business in the Commonwealth of Massachusetts and have their principal places of business in the Commonwealth of Massachusetts.  In addition, upon information and belief, GPM, Inc., has its principle place of business in the Commonwealth of Massachusetts.

23.     Upon information and belief, Mr. Gallagher, Mr. Gottschlicht, and Attorney Reilly are officers of and control each of INSA, LLC; GPM, Inc.; and GPM Alpha, including through the business that they conduct in the Commonwealth of Massachusetts.  Mr. Gallagher and Mr. Gottschlicht are officers of and control GPM Investment, LLC, through the business that they conduct in the Commonwealth of Massachusetts.

24.     Upon information and belief, all Members of GPM II, LLC, Kalyx, LLC, INSA, LLC, and GPM Investment, LLC, are citizens of states other than Texas.  Based on information obtained through an investigation by Mr. Komassa's counsel, and information produced voluntarily by GPM II, LLC, Kalyx, LLC, and INSA, LLC, Mr. Komassa submits the information set forth in the attached Exhibit A, concerning the identities and states of citizenship of the members of GPM II, LLC, Kalyx, LLC, and INSA, LLC, and, as necessary, the members or trustees of those members (the citizenships of which are based on information and belief, based on information provided to counsel).

25.     Venue is properly laid in this Court pursuant to 28 U.S.C. § 1391.  Further, upon information and belief, one or more Defendants may be found in this District and a substantial part of the events giving rise to these claims have occurred and are occurring in this District.

**FACTUAL ALLEGATIONS**

26.     Mr. Komassa had previously worked with Mr. Gallagher between 2009 and 2012, when the two shared an office working for a hedge fund and where they often discussed and collaborated on other potential ventures.

27.     Beginning in 2013, Mr. Gallagher began to discuss with Mr. Komassa seeking one or more licenses for medical cannabis in Massachusetts for a venture initially called Hampden Care Facility ("HCF") and later renamed I.N.S.A., Inc.

28.     In 2013, HCF applied for a medical cannabis license in Massachusetts under Mr. Gallagher's direction, but the application was unsuccessful.

29.     HCF was originally incorporated in Massachusetts as a non-profit corporation on August 4, 2013.  Its original Articles of Organization list Tom Gallagher as the President, Treasurer, and Clerk.  They also list Tom Gallagher and Mr. Gallagher as the company's Directors.

30.     Upon information and belief, Thomas Gallagher who is Mr. Gallagher's father, was initially listed in the company's formation documents so that Mr. Gallagher could distance himself from the stigma associated with cannabis.

31.     Mr. Gallagher sought to keep his involvement in the cannabis industry confidential because of his relationship with Signpost Capital Advisors, LP ("Signpost"), which he perceived would have disapproved of his involvement in a cannabis venture.

32.     In a text message that Mr. Komassa received on November 25, 2013, Mr. Gallagher told Mr. Komassa that his offer for a position with Signpost "was pending background checks, so I'm really hoping HCF doesn't come up."

33.     Mr. Gallagher also wrote to Mr. Komassa that he was trying to keep his involvement in the cannabis venture "on the DL . . .."  Upon information and belief, "DL" refers to "down low," reflecting Mr. Gallagher's intent to keep his involvement non-public or confidential.

34.     On December 31, 2013, HCF changed its Directors and Officers, removing Peter Gallagher as a Director, and listing Tom Gallagher, Jennifer Gottschlicht, Alesia Days, Shawn Charest, William Ketchen, and Bruce Nassau as Directors.  Thomas Gallagher's name remained listed for all Officer positions.

*Mr. Gallagher Invites Mr. Komassa to Join a Cannabis Venture*

35.     On September 14, 2014, Mr. Gallagher met with Mr. Komassa and asked Mr. Komassa to assist him in renewing HCF's application for a medical cannabis license in Massachusetts.

36.     Initially, Mr. Komassa was not interested in joining the venture on a full-time basis, as he was engaged as the Managing Partner of another entity at the time, but he provided input and advice to Mr. Gallagher as a friend.

37.     Mr. Komassa became increasingly involved, on an informal basis, in the cannabis venture that Mr. Gallagher was assembling.  Mr. Komassa's contribution to the venture evolved to include: (i) identification of and review of correspondence to proposed board members and investors; (ii) review of financial projections, investor solicitation materials, and other documents; (iii) review of cannabis license application materials; and (iv) providing strategic advice for the application and business.  Mr. Komassa also introduced Mr. Gallagher to potential financiers.

38.     However, in April 2015, Mr. Gallagher began seeking more formal involvement from Mr. Komassa, asking Mr. Komassa if he would serve as the Chief Financial Officer ("CFO") to be listed on the company's application.  The individual who had been listed as the CFO on HCF's prior application was equivocating as to whether he would continue to serve as the CFO.

39.     Mr. Gallagher also wanted Mr. Komassa to investigate funding options for HCF.

40.     Mr. Gallagher offered Mr. Komassa an ownership stake and a non-Chief Executive Officer role in a for-profit management company to be created, if the application was successful.

41.     Mr. Komassa was initially hesitant to become involved in the venture in a public capacity due to the stigma that surrounded cannabis at the time, which stigma still exists today to some degree.

42.     In May 2015, Mr. Gallagher continued to pursue his request for Mr. Komassa to serve as the CFO, asking Mr. Komassa for his résumé and asking whether he would consent to a background check.

43.     In June 2015, 10 days before initial applications were due, Mr. Gallagher again asked Mr. Komassa if HCF could list him as the CFO in the Massachusetts application.  In a text message received on June 20, 2015, Mr. Gallagher asked Mr. Komassa, "Can I put you down on our app as CFO?  The other guy bailed last minute."

44.     Mr. Gallagher further indicated to Mr. Komassa that the application would suffer, and likely not succeed, if Mr. Komassa would not agree to be listed as CFO on the application.

45.     Mr. Komassa continued to be reluctant to be associated publicly with a cannabis company, which would put his personal and professional reputation at risk in light of the stigma associated with cannabis.

46.     Mr. Gallagher sought to include Mr. Komassa on the application because he knew that Mr. Komassa's background and credentials as an investor and entrepreneur with operational, financial, and technology experience would strengthen the application and ability to attract investors.

47.     In particular, Mr. Komassa had previously worked for a leading investment bank, and had experience working for a respected investment firm helping to manage a large investment portfolio, in addition to his successful experience as an entrepreneur.

48.     On June 22, 2015, Mr. Gallagher called Mr. Komassa to plead with him to be listed as the CFO for the application.  Mr. Gallagher promised Mr. Komassa that if a medical cannabis license was awarded to HCF, Mr. Komassa would be a partner, and hold a minority equity stake, in a management company that they would create.

49.     In reliance on Mr. Gallagher's promise, Mr. Komassa agreed to allow his name and reputation to be used as part of HCF's medical cannabis application in Massachusetts, and HCF, in fact, listed Mr. Komassa as the CFO on its application to the Commonwealth and on other subsequent public proposals to local municipalities.

50.     Mr. Komassa executed a Character and Competency form for submission with the application, and supplied his education, employment history, experience running a for-profit business, and experience related to health care services.

51.     Mr. Komassa also provided CFO-related services, such as reviewing and revising financial projections and exploring mechanisms to fund the business.

52.     Mr. Komassa was instrumental in helping HCF to obtain multiple medical cannabis licenses in Massachusetts.  Upon information and belief, HCF would not have been able to submit an application for a medical cannabis license – at least not a competitive one – without someone acting as CFO or in a similar capacity.

53.     Mr. Gallagher did not want to serve in the CFO role or have his name listed as an executive on the license due to fear of losing his job with Signpost.  Upon information and belief, Signpost had expressly forbidden Mr. Gallagher from operational involvement with a cannabis company.

54.     In an e-mail on June 23, 2015, Mr. Gallagher introduced Mr. Komassa to other team members David Benlolo, Meg Alderton, and Teah Rw, as "the new CFO of HCF."  On

June 29, 2015, with Mr. Komassa listed as CFO, HCF completed the first phase of Massachusetts's multi-step cannabis application process by submitting three "application of intent" forms for locations in Easthampton, Springfield, and Chicopee.

55.     In July and August 2015, Mr. Komassa continued to review and revise other components of the application, helped prepare siting proposals for local municipalities, prepared and revised financial models, and consulted with Mr. Gallagher on financial issues.

56.     On August 14, 2015, for the second phase of the application process, HCF submitted "Management & Operations Profiles," which included detailed information on Mr. Komassa's career and accomplishments.

57.     From September 2015 to December 2015, Mr. Komassa and Mr. Gallagher continued to meet, discuss, and pursue HCF matters in person and via telephone.  On December 7, 2015, HCF learned that it had been approved to advance to the third phase of the application process, submitting "siting proposals" to the Commonwealth for each desired location.

58.     On January 7, 2016, Mr. Gallagher sent a text message to Mr. Komassa asking him: "What are your thoughts on potentially being the actual CFO of HCF?  Our CO guys seem to think that we need a real CFO."  Mr. Komassa understood Mr. Gallagher to be asking him to serve in this capacity long-term.

59.     Mr. Komassa initially did not want to be pigeonholed as the CFO and wanted to have the flexibility to focus on other functions that might not traditionally be associated with a CFO role, such as planning strategic expansion, marketing, and other operations of the company.

60.     Mr. Komassa agreed to serve in the role of CFO, at least for an initial period to lay the foundation for a permanent CFO for the entity, with the discussed plan of transitioning into a broader executive role focusing on growth, marketing, and technology.

*Mr. Komassa's Involvement Evolves into a Partnership*

61.     In the first six months of 2016, as HCF moved further through the state

application process and obtained municipal approvals for the company's facilities, Mr. Komassa

continued to work to make HCF a success.  For example, in January 2016, Mr. Komassa

recruited a trusted design contact and worked with her over multiple months to design and

launch HCF brand assets including a website, multiple social media pages, business cards,

letterhead, and a newsletter template.

62.     During this time, Mr. Komassa also researched dispensary payment solutions and

developed a checklist of related technology programs needed to launch and operate HCF.

Further, Mr. Komassa began compiling industry research, building a database of grower

contacts, and in June 2016, he attended a cannabis trade show in New York to gather market

intelligence and bolster HCF's industry contacts.  Finally, after performing market research, Mr.

Komassa developed a timeline, goals, and the outline of an investment pitch for the management

company's Series-A capital raise.

63.     On June 23, 2016, Mr. Gallagher met with Mr. Komassa and requested that Mr.

Komassa guide a Series-A capital raise and help build their for-profit management company,

which included Mr. Gottschlicht, and subsequently Attorney Reilly, as the other two partners.

64.     The management company was expected to provide its owners with meaningful

economic rewards by: (i) providing financing and services to HCF in exchange for fees; (ii)

pursuing direct ownership of recreational cannabis licenses in Massachusetts; and (iii) pursuing

medical and recreational cannabis licenses in other states.

65.     Further to their agreement that Mr. Komassa would be compensated with a

minority interest in the new management company, Mr. Komassa and Mr. Gallagher discussed

the overall equity ownership of the entity along with Mr. Komassa's ownership stake of 10% after factoring in dilution from the Series-A raise.

66.     On June 30, 2016, HCF was awarded its first provisional cannabis license to cultivate, process, and dispense cannabis in Easthampton.  On this date, Mr. Gallagher and Mr. Komassa met again to discuss the details of a Series-A capital raise.  Mr. Komassa made clear that he wanted to receive at least 10% equity post-Series-A dilution and that he would devote at least 50% of his working time to HCF and the management company.  Mr. Gallagher consented to this agreement.

67.     Mr. Gallagher and Mr. Komassa agreed that Mr. Komassa would also receive salary for his role preforming CFO or other operational services.

68.     In early July 2016, Mr. Komassa and Mr. Gallagher agreed on the name of Green Park Management, Inc. ("GPM, Inc.") as the name of their management company.  They also scheduled research trips to California and Colorado, and further developed the details of their investment solicitation, including the equity stakes for the parties involved and a 15% carried interest for the partners.

69.     On July 9, 2016, Mr. Komassa and Mr. Gallagher met again in New York, this time on Mr. Gallagher's sailboat.  Mr. Gallagher affirmed his agreement to Mr. Komassa's equity stake of 10% post-Series A investment (or 12.5% pre-investment) in GPM, Inc., the management company.

70.     Mr. Gallagher and Mr. Komassa also agreed that this equity split would apply to any cannabis venture that they pursued as a result of the preceding and impending time and effort that Mr. Komassa had invested and was continuing to invest in reliance on this agreement.

71.     In reliance on this agreement, Mr. Komassa devoted substantially more time and effort than he had previously to making HCF and the management company a success.  He recruited and interviewed growers, extraction experts and other future employees.  He identified and interviewed vendors, led calls with licensing partners, and made numerous trips to cultivation facilities and dispensaries to research organizational processes needed to launch and operate HCF successfully.  Mr. Komassa also worked to procure banking relationships, helped negotiate and draft pivotal agreements, including leases, signed legal agreements, guided strategy, including strategizing expansion in the Massachusetts market, and developed a product brand and product packaging.

72.     For example, on and around July 18, 2016, Mr. Komassa worked with Mr. Gallagher to develop a compensation structure, including a base salary, cash bonuses, and equity ownership in the management company, that would entice Mark Zytrka, a healthcare executive, to join HCF full-time as its CEO and first key hire.  Mr. Zytrka accepted the position with HCF and remains the CEO of I.N.S.A., Inc. (f/k/a HCF), to this day.

73.     Mr. Komassa's work also included researching and opining on financial and accounting questions, recruiting an accountant and bookkeeper, developing an online marketing presence and strategy, and preparing incorporation documents for several of the entities, including GPM, Inc.; GPM Alpha; and Keystone Medical Access, LLC.

74.     When Mr. Komassa prepared to incorporate GPM, Inc., Mr. Gallagher told him that "[t]here is a way to do it to shield your identity," reflecting his ongoing aversion to being publicly associated with a cannabis company.   Mr. Gallagher told him that if Signpost found out about his affiliation with a cannabis company he would "get iced."

13

75.     Mr. Komassa also engaged in numerous other essential functions and was primarily responsible for drafting the terms of the Master Services Agreement to codify the management relationship between GPM, Inc., or GPM Alpha and the license-holding entities, including HCF or I.N.S.A., Inc.

76.     With respect to fundraising, Mr. Komassa led the development of the sales pitch, an investor solicitation presentation, and marketed the opportunity to numerous potential investors.  This subsequently included leading many investor presentations, advising Mr. Gallagher with respect to his participation in investor meetings, and providing substantial leadership and support for the successful fundraising effort.

*The Capital Raise*

77.     On August 12, 2016, during the period of Mr. Komassa's contributions listed above, HCF received its second provisional cannabis license to operate a medical dispensary in Springfield, Massachusetts.  Today, HCF holds licenses to: (i) cultivate, process, and dispense medical and recreational cannabis in Easthampton, Massachusetts; (ii) dispense medical cannabis in Springfield, Massachusetts; and (iii) dispense recreational cannabis in Salem, Massachusetts.

78.     Coinciding with the second license approval, Mr. Komassa and Mr. Gallagher finalized their investment pitch and the proposed terms and structure of the Series-A raise.  The final terms agreed upon by Messrs. Komassa, Gallagher, and Gottschlicht, and Attorney Reilly designated: (i) a 25% equity stake in GPM, Inc., for seed investors; (ii) a 20% equity stake for Series-A investors; (iii) a 15% equity stake for key employees / advisors; and (iv) a 40% "sweat equity stake" for the four partners.

79.     Each partner would receive one quarter of the total 40% stake, or 10% each.  Mr. Gallagher and Mr. Gottschlicht would separately split the 25% seed equity stake based on the

14

amount of seeding financing each provided.  Such percentages were specifically designated to be after dilution from the then-contemplated Series-A equity funding.

80.     The partners also agreed upon a 15% "carried interest" in the management company, which would be triggered upon obtaining a recreational cannabis license in Massachusetts and hitting certain financial performance targets.  The four partners agreed to split equally the 15% "carried interest," such that each would receive 3.75% of GPM, Inc.'s profit distributions over and above their defined ownership percentages.

81.     Pursuant to their agreement, in September 2016, the partners began to solicit investments in a Series A round for GPM, Inc., incorporated as a Delaware corporation in December 2016.  Over the ensuing months, Mr. Komassa and Mr. Gallagher distributed their investor solicitation presentation to over 25 interested parties and held conference calls and in-person meetings to walk prospective investors through GPM, Inc.'s story, team, and opportunity.

82.     For example, in October 2016, Mr. Gallagher and Mr. Komassa traveled to Springfield and Chicopee, Massachusetts, to meet with potential investors, including investors that eventually provided the initial capital for the Series-A round.  The investors were highly complementary of the investment materials and pitch that Mr. Komassa had created.

83.     During the capital raise process, Mr. Gallagher, Mr. Komassa, Mr. Gottschlicht, and Attorney Reilly held themselves out as partners in GPM, Inc., each entitled to a 10% stake in the 40% pool set aside for "managing partner sweat equity" and a "pro rata" share of the 15% carried interest.  In addition, Messrs. Gallagher and Gottschlicht represented that they were the providers of $2.6 million in seed capital and entitled to a 25% combined incremental stake.

84.     For example, an investor solicitation presentation dated October 20, 2016, specifically cites a set-aside pool of 40% for "Managing Partners" and lists Mr. Gallagher, Mr.

Komassa, Mr. Gottschlicht, and Attorney Reilly as the partners.  This same document also lists Mr. Komassa on the Board of Directors of GPM, Inc.

85.     GPM, Inc., also presented signed term sheets to approximately five to ten potential investors listing Mr. Komassa as a Managing Partner and a member of the Board of Directors.  These term sheets generally reflected the partners' sweat equity pool as 50% pre-Series-A investment round and 40% post-Series-A investment round.

86.     The term sheets also reflected that the partners would share in a carried interest of 15% of distributed cash flows or proceeds from recreational cannabis sales in Massachusetts.

87.     Additionally, on October 14, 2016, Mr. Gallagher sent Mr. Komassa a text message in advance of a call that they were having with an investor, asking Mr. Komassa to "talk to the sweat equity and promote," referring to the individual ownership percentages of the managing partners and the carried interest to which they had agreed.

88.     A "promote" is jargon for a carried interest in the profits or returns of a company, often earned as sweat equity, as was the case here.

89.     The partners also participated in weekly "HCF Partner Calls" to discuss the capital raise and the company's progress.  On one occasion, Mr. Gallagher asked to postpone the "partner call" due to a scheduling conflict that he had related to Signpost.

90.     Further to their partnership, Mr. Gallagher held Mr. Komassa out as his partner in numerous external communications.  For example:

- On August 3, 2016, Mr. Gallagher sent Mr. Komassa a draft e-mail to a potential advisor describing Mr. Komassa as the "CFO/Managing Partner."

- On September 13, 2016, Mr. Gallagher sent an e-mail to a proposed investor, and former colleague of Mr. Komassa, describing Mr. Komassa as the "CFO/Managing Partner," and describing that Mr. Komassa had been "spearheading" the capital raise efforts.

91.     Throughout the capital raise process, Mr. Gallagher touted HCF's and GPM, Inc.'s "proven management team" as one of his key messages to potential investors.

92.     In December 2016, demonstrating the importance of GPM, Inc.'s management team (which included Mr. Komassa), an investor asked to perform reference checks on the managing partners and held conference calls with three former colleagues of Mr. Komassa to verify his track record and accomplishments.

93.     In December 2016, Mr. Gallagher also told Mr. Komassa by text message, "We're a good combo bc you sell it hard[,] and I come across as [the] beancounter."

94.     By the end of December 2016, and largely due to Mr. Komassa's leadership and efforts, the partners had obtained firm Series-A commitments of approximately $1 million in capital with commitments up to $10 million from other potential investors still performing due diligence, including a billion-dollar hedge fund and a respected investment advisory firm.

95.     After receiving initial checks totaling $625,000 in capital, the partners incorporated GPM, Inc., as a Delaware corporation in December 2016.

96.     Mr. Komassa was responsible for preparing the documents necessary to incorporate GPM, Inc., and obtain a tax employer identification number from the United States Internal Revenue Service.  The law firm Doherty, Wallace, Pillsbury & Murphy, P.C., assisted in filing the documents.

*The Pennsylvania License*

97.     In January 2017, the partners continued capital raise discussions but quickly realized that they needed to demonstrate the ability to expand beyond Massachusetts to firm up commitments from lingering investors.

17

98.     The partners embarked on an opportunity to pursue a license in Pennsylvania. While other applicants had been working on their applications for approximately twelve months, the partners only had approximately three months to submit an application.

99.     The partners agreed that Mr. Komassa would lead efforts to pursue a cannabis license in Pennsylvania, incorporate and otherwise set up a Pennsylvania cannabis company, and ultimately serve as the Chief Operating Officer of the Pennsylvania entity.

100.    Mr. Komassa thereafter spent the next few months traveling around Pennsylvania meeting with regulators, scouting real estate, negotiating lease agreements, meeting with key stakeholders, and presenting to local community leaders at town halls to lay the groundwork for a competitive license application.

101.    In his capacity as a Managing Partner in GPM, Inc., Mr. Komassa executed retainer agreements for professional services needed to develop, construct, and operate cannabis cultivation and distribution facilities in Pennsylvania.

102.    In March 2017, the partners incorporated Keystone Medical Access, LLC ("KMA"), as a wholly-owned subsidiary of GPM, Inc., to be the vehicle to apply for and hold the Pennsylvania license.

103.    On March 17, 2017, Mr. Komassa executed a Sales Agreement, in his capacity as Chief Operating Officer of KMA, to acquire property for KMA's cultivation facility in Pennsylvania.  In March 2017, and in his capacity as a Partner in KMA, Mr. Komassa also executed another Sales Agreement and two Excess Maintenance Agreements with different municipalities

104.     Using the research, relationships, and approvals largely gathered by Mr. Komassa in Pennsylvania, Mr. Komassa and Mr. Gallagher invested significant time drafting and building a 200-page license application.

105.     On March 20, 2017, KMA submitted the application for a Pennsylvania cannabis cultivation license.

106.     The KMA application lists Mr. Komassa as having a 10% ownership stake in KMA, which as a wholly-owned subsidiary of GPM, Inc., denotes a 10% ownership stake in GPM, Inc.

107.     In addition, the KMA application listed Mr. Komassa as the company's Chief Operating Officer.  It further confirmed that Mr. Komassa was a Managing Partner in Green Park Management and Chief Financial Officer of HCF.

108.     The KMA application also identified Mr. Komassa as "an accomplished investor and entrepreneur who brings significant operational, financial, and technology experience to the KMA management team."

109.     Upon information and belief, Mr. Gallagher reviewed and approved the KMA application, and verified the accuracy of its contents, under oath.

110.     Mr. Gottschlicht and Attorney Reilly did not contribute significantly to KMA's application in Pennsylvania.  In fact, during a text message exchange on March 17, 2017, Mr. Gallagher wrote to Mr. Komassa that Attorney Reilly was "an idiot."

111.     Attorney Reilly's work on the KMA application was riddled with errors, which prompted Mr. Gallagher to write "[Reilly] Did a dog shit job then blew off a call . . . his contribution to this app has been zero."

112.    During this three-month period of focusing on Pennsylvania, Mr. Komassa stayed actively involved in the capital raise process and other facets of the business.

113.    For example, on January 4, 2017, Mr. Komassa helped review and prepare slides responding to diligence questions from Donald Jackson, a prospective investor and advisor.  The due diligence slide deck included an organizational chart titled "First 12 Months" that listed Mr. Komassa as GPM, Inc.'s CFO.  The slide deck included another organizational chart titled "Long Term Vision" that listed Mr. Komassa listed as GPM, Inc.'s, "CFO / Business Dev" head.

114.    In February 2017, Mr. Komassa and Mr. Gallagher reviewed a draft term sheet for a potential investor, and, with respect to their carried interest, Mr. Gallagher noted, "They get their preferred and then we split the common dividends *pro rata*."

115.    In March 2017, Mr. Komassa led in-person investor meetings with institutional investors, helped negotiate Donald Jackson's advisory compensation structure, engaged a law firm to finalize GPM, Inc.'s Master Services Agreement with HCF, and helped negotiate the final terms of the Series-A capital raise with GPM, Inc's lead investors.

116.    On March 20, 2017, Mr. Gallagher sent final signed term sheets to Thompson Dean outlining terms of a $6 million Series-A investment and a $10 million Series-B investment with the latter at a $70 million post-money valuation but subject to the award of a Pennsylvania license.

117.    On March 28, 2017, based on investor feedback and advice from tax experts, the partners initiated the conversion of their management company, Green Park Management, from a C corporation to a more tax-efficient limited liability company by incorporating GPM Alpha, as a Delaware limited liability company.

20

118.    With firm commitments totaling $7.5 million and expected final commitments of $8.5 million, the lead Series-A investors asked the managing partners to: (i) procure a law firm to represent the investors; and (ii) retain a separate law firm that would represent the management company and draft final investor agreements.

119.    On April 4, 2017, Mr. Komassa executed an engagement letter agreement with the law firm Morse Barnes-Brown Pendleton, P.C., to, among other duties, prepare Series-A legal documents including an Operating Agreement, Investors' Rights Agreement and a Unit Purchase Agreement.  Mr. Komassa engaged the firm on behalf of GPM Alpha, and as its Managing Partner.

120.    On April 5, 2017, the partners introduced investors to Harvey Kesner, a lawyer with cannabis experience.  After discussion and review, the investors approved Attorney Kesner as their legal counsel, which, in the minds of the partners, removed the remaining obstacle to finalizing the Series-A capital raise.

### Mr. Gallagher Reneges on His Agreement with Mr. Komassa

121.    On or about April 10, 2017, Mr. Gallagher's employer, Signpost, announced that it was shutting down, and coinciding with that event, Mr. Gallagher joined Green Park Management in a full-time capacity.

122.    With licenses procured in Massachusetts, the application submitted in Pennsylvania, and $7.5 million of Series-A capital firmly committed, Mr. Gallagher immediately moved to renege on his agreement with Mr. Komassa.

123.    On April 10, 2017, Mr. Gallagher asked Mr. Komassa if he was available for a teleconference "to go thru the splits," referring to a review of the pre- and post-raise equity stakes of all the partners, investors, advisors, and employees.

124.    On April 11, 2017, Mr. Gallagher sent Mr. Komassa what was supposed to reflect a capitalization table.  However, when he received the document, Mr. Komassa noticed that his stake had been putatively reduced to 5% pre-investment and 3.45% post-investment.  This reflected a significant departure from what Mr. Gallagher and Mr. Komassa had agreed and to which Mr. Gottschlicht and Attorney Reilly assented when they joined the partnership and held Mr. Komassa out to investors as a partner with a 10% equity stake.

125.    Mr. Komassa immediately confronted Mr. Gallagher, who sought to diminish the substantial sweat equity that Mr. Komassa had invested, and all of the work that he had performed without payment.

126.    Mr. Gallagher told Mr. Komassa that "you have no leverage anymore" and that Mr. Komassa's stake had to be reduced because Mr. Gallagher and Mr. Gottschlicht did not want their collective equity position to fall below 50% after a subsequent Series-B round of financing.

127.    Later on during the call, Mr. Gallagher expressed to Mr. Komassa that he was "sick all week worrying about the discussion," because Mr. Gallagher knew that the reduction of Mr. Komassa's equity stake to 3.45% was a substantial departure from the 10% post-raise stake that Mr. Gallagher had agreed to with Mr. Komassa.

128.    On or about April 12, 2017, Mr. Gallagher told Mr. Komassa by e-mail that he believed that Mr. Komassa was no longer a partner, but would be considered an advisor.

129.    On April 17, 2017, Mr. Komassa and Mr. Gallagher spoke again.  Directly subsequent to the call, Mr. Komassa discovered that Mr. Gallagher had deleted Mr. Komassa's HCF e-mail account (peterk@hampdencare.org), along with the cloud folder, files, and calendar linked to Mr. Komassa's e-mail account.

130.    This was the primary e-mail account that Mr. Komassa used for his partnership activities and dealings with Mr. Gallagher.

131.    This e-mail address was set up as a Google "G Suite business" cloud e-mail account.

132.    Upon information and belief, Mr. Gallagher was the sole administrator for the HCF e-mail and only he had the permissions necessary to delete Mr. Komassa's e-mail account, a process that would require multiple deliberate actions and trigger deletion alert warnings.

133.    For example, in January 2017, Mr. Gallagher confirmed that he could both delete and re-enable HCF e-mail accounts.

134.    Upon information and belief, Mr. Gallagher deleted Mr. Komassa's e-mails, files, and other data, and the information is irretrievably lost.

135.    Mr. Gallagher caused this deletion and loss of evidence after he was aware that Mr. Komassa disputed the purported reduction of his equity stake and his ouster from the partnership.

136.    Mr. Komassa's user account contained more than 1,000 e-mails, numerous calendar entries and many documents that would illustrate the sweat equity that Mr. Komassa invested and corroborate the partnership agreement.

137.    Mr. Komassa's leadership in the business required him to travel from Austin, Texas, to New York, Massachusetts, Pennsylvania, Colorado, and California for meetings with investors and other prospective collaborators, which he did in order to help the venture succeed. Mr. Komassa incurred more than $22,000 in out-of-pocket travel and other business expenses in connection with his work for the venture between 2015 and 2017.

138.    Mr. Gallagher initially refused to reimburse any expenses unless Mr. Komassa executed a release of claims, which Mr. Komassa refused to do.  Mr. Gallagher, instead, offered to pay Mr. Komassa $5,000 for using his name on the application, which Mr. Komassa also refused.

139.    Almost immediately after ousting Mr. Komassa from the venture, in May 2017, the remaining partners incorporated GPM II, LLC, as a Delaware limited liability company. Upon information and belief, Mr. Gallagher, Mr. Gottschlicht, and Attorney Reilly continue to pursue the partnership's opportunities, including through GPM II, LLC, which provides capital and services to I.N.S.A., Inc.

140.    In November 2017, HCF changed its name to INSA, Inc., and then changed its name again to I.N.S.A., Inc., in January 2018, when it transitioned to a for-profit entity licensed to sell recreational cannabis in Massachusetts.

141.    Mr. Gallagher is currently listed as President, Treasurer, and Secretary, as well as a Director, of I.N.S.A., Inc.

142.    The remaining partners also incorporated INSA, LLC, in Pennsylvania to obtain another cultivation license.  INSA, LLC's successful application heavily incorporated the insight, strategy, and plan that Mr. Komassa had developed as part of the prior application in Pennsylvania.

143.    In particular, INSA, LLC, secured a unique location that Mr. Komassa had identified and negotiated with the landowner.  In addition, the application leveraged much of the groundwork that Mr. Komassa had laid, including the goodwill and political capital that he had earned with local community leaders and regulators.

24

144.     In addition, upon information and belief, including based on public records filed with the Secretary of the Commonwealth of Massachusetts, Mr. Gallagher, Mr. Gottschlicht, and Attorney Reilly have incorporated Kalyx for the purpose of seeking additional cannabis licenses or providing other cannabis-related services in Massachusetts.  Any business that Kalyx would be conducting in the cannabis industry in Massachusetts is an opportunity belonging to the partnership and, upon information and belief, builds upon ideas or plans that Mr. Komassa put into place before he was purportedly ousted from the partnership.

145.     Between June 2015 and April 2017, Mr. Komassa invested a substantial amount of time and effort working for the venture.  This included working, at times, more than 70 hours per week and extensive travel, especially in Pennsylvania where the partners were seeking to obtain a license.

146.     Meanwhile, Mr. Gallagher had maintained his affiliation with Signpost through early April 2017, while inducing Mr. Komassa to perform extensive and valuable services, allegedly for the benefit of their partnership.  When the capital raise that Mr. Komassa had led was nearly closed, and Mr. Gallagher was confident that the partnership had raised sufficient funds, and he had lost employment at Signpost, he joined the venture full-time and within days attempted to oust Mr. Komassa from the partnership venture.

**COUNT I**
**Breach of Contract**
**(Against Defendants Gallagher, Gottschlicht, and Reilly)**

147.     Plaintiff restates the allegations contained in the paragraphs above as if fully set forth herein.

148.     Mr. Komassa entered into a partnership agreement with Mr. Gallagher, Mr. Gottschlicht, and Attorney Reilly.

149.     The partnership agreement is a valid and enforceable Massachusetts contract supported by a mutual exchange of promises and consideration.

150.     Under the partnership agreement, Mr. Komassa agreed to serve as the CFO for HFC and help obtain a medical cannabis license for HCF in Massachusetts, as well as to guide a capital raise.  Mr. Komassa also undertook numerous other activities and pursued a medical cannabis cultivation license in Pennsylvania.

151.     The partners agreed that, in exchange for their sweat equity, they would each receive a 10% post-dilution interest in the partnership venture.

152.     The partners initially incorporated GPM, Inc., later converted to GPM Alpha, and raised capital for that entity, which was intended to serve as an investment vehicle and management company for the cannabis entities.

153.     At all times Mr. Komassa performed in accordance with the partnership agreement.

154.     Mr. Gallagher, Mr. Gottschlicht, and Attorney Reilly materially breached the partnership agreement by denying Mr. Komassa his interest in the ventures and continuing to pursue partnership ventures based on Mr. Komassa's ideas and sweat equity without Mr. Komassa.

155.     Mr. Gallagher, Mr. Gottschlicht, and Attorney Reilly have also continued to use the ideas, financial models, negotiated terms, relationships, and other groundwork that Mr. Komassa developed to continue to pursue partnership opportunities.

156.     Mr. Komassa has suffered injury directly and proximately caused by Mr. Gallagher's, Mr. Gottschlicht's, and Attorney Reilly's breach of the partnership agreement.

157.     Each of Mr. Gallagher, Mr. Gottschlicht, and Attorney Reilly have benefitted from their breach of the partnership agreement.

158.     As a result of the foregoing, Mr. Komassa has and will continue to suffer irreparable harm that cannot be adequately redressed at law.  Unless this Court grants injunctive relief, Mr. Komassa will be irreparably harmed in a manner not fully compensable by damages.

## COUNT II
### Breach of Implied Covenant of Good Faith and Fair Dealing
### (Against Defendants Gallagher, Gottschlicht, and Reilly)

159.     Plaintiff restates the allegations contained in the paragraphs above as if fully set forth herein.

160.     Implied in every Massachusetts contract is a covenant of good faith and fair dealing.

161.     The partnership agreement is a valid Massachusetts contract, and thus a covenant of good faith and fair dealing is implied therein.

162.     Mr. Gallagher, Mr. Gottschlicht, and Attorney Reilly breached the covenant of good faith and fair dealing by using Mr. Komassa's hard work and expertise to apply for a medical cannabis license in Massachusetts, lay the groundwork for a successful application in Pennsylvania, and establish a successful capital raise, only to oust Mr. Komassa once they secured commitments for the capital raise.

163.     Mr. Gallagher, Mr. Gottschlicht, and Attorney Reilly further breached the covenant of good faith and fair dealing by continuing to use the ideas, financial models, negotiated terms, relationships, and other groundwork that Mr. Komassa developed to continue to pursue partnership opportunities.

164.    To the extent that Mr. Gallagher, Mr. Gottschlicht, and Attorney Reilly had any right to terminate the partnership with Mr. Komassa, any purported termination of the partnership was not done in good faith because it was done only after Mr. Komassa provided valuable ideas, work, and other sweat equity, which Mr. Gallagher; Mr. Gottschlicht; Attorney Reilly; GPM II, LLC; I.N.S.A., Inc.; Kalyx; and INSA, LLC, continue to use today without any benefit to Mr. Komassa.

165.    As a direct and proximate cause of the breaches by Mr. Gallagher, Mr. Gottschlicht, and Attorney Reilly, Mr. Komassa has and will continue to suffer substantial direct and consequential damages and irreparable harm for which there may be no adequate remedy at law.

### COUNT III
### Breach of Fiduciary Duty
### (Against Defendants Gallagher, Gottschlicht, and Reilly)

166.    Plaintiff restates the allegations contained in the paragraphs above as if fully set forth herein.

167.    Under Massachusetts law, partners owe one another fiduciary duties of utmost good faith and loyalty.

168.    Mr. Gallagher induced Mr. Komassa to lend his name and reputation to the HCF application and perform valuable services, including operational services and developing and executing a plan to solicit investors, after which Mr. Gallagher ousted Mr. Komassa to usurp the partnership's opportunities for himself, Mr. Gottschlicht, and Attorney Reilly in breach of their fiduciary duties of good faith and loyalty to Mr. Komassa.

169.    Mr. Gottschlicht was aware of Mr. Komassa's extensive efforts, and Mr. Gallagher reported to Mr. Komassa that he and Mr. Gottschlicht sought to avoid a reduction in

their separate equity stake below 50%, which was the alleged reason for the reduction (or elimination) of Mr. Komassa's partnership interest. Mr. Gallagher and Mr. Gottschlicht were both responsible for the decision to reduce Mr. Komassa's equity stake for their personal gain.

170.    Upon information and belief, Attorney Reilly was also aware of and assented to the decision to oust Mr. Gallagher from the partnership.

171.    Mr. Gallagher, Mr. Gottschlicht, and Attorney Reilly all personally benefitted from an increased stake in the partnership proceeds due to the ouster of Mr. Komassa.

172.    In addition, Mr. Gallagher, Mr. Gottschlicht, and Attorney Reilly continue to pursue partnership opportunities based on Mr. Komassa's contributions.

173.    As a direct and proximate result of Mr. Gallagher's, Mr. Gottschlicht's, and Attorney Reilly's breaches, Mr. Komassa has and will continue to suffer substantial direct and consequential damages and irreparable harm for which there may be no adequate remedy at law.

## COUNT IV
### *Quantum Meruit*
### (Against Mr. Gallagher, I.N.S.A., Inc., and GPM II, LLC)

174.    Plaintiff restates the allegations contained in the paragraphs above as if fully set forth herein.

175.    As described above, Mr. Gallagher promised Mr. Komassa that he would be compensated with an equity interest in the for-profit management company that they were going to create if I.N.S.A., Inc. (f/k/a/ HCF), was awarded a medical cannabis license in Massachusetts.

176.    In reasonable reliance on Mr. Gallagher's promises, Mr. Komassa agreed to be listed as CFO in HCF's successful application for a medical cannabis license in Massachusetts, and devoted substantial time and energy in undertaking numerous activities, to help develop a foundation for HCF.

177.    Mr. Gallagher and I.N.S.A., Inc., were aware that Mr. Komassa was not providing his services for free.

178.    Mr. Gallagher and I.N.S.A., Inc., however, have failed and refused to honor Mr. Gallagher's promise and obligation to Mr. Komassa by refusing to provide him his financial interest in the partnership ventures.

179.    In doing so, Mr. Gallagher and I.N.S.A., Inc., have retained a benefit for their exclusive use, causing Mr. Komassa to suffer damages.

180.    In addition, Mr. Komassa provided valuable services relating to the planning and execution of a capital raise that provided significant value for GPM Alpha, which benefit Mr. Gallagher transferred to GPM II, LLC, and which GPM II, LLC, continues to enjoy today.

181.    Mr. Gallagher and GPM Alpha were aware that Mr. Komassa was not providing his services for free.

182.    Mr. Gallagher and GPM Alpha, however, have failed and refused to honor Mr. Gallagher's promise and obligation to Mr. Komassa by refusing to provide him his financial interest in the partnership ventures.  Instead Mr. Gallagher has transferred the value conferred by Mr. Komassa's work and ideas to GPM II, LLC.

183.    To the extent that the trier of fact finds that Mr. Komassa did not form a partnership agreement with Messrs. Gallagher and Gottschlicht, and Attorney Reilly, or that specific performance of the partnership agreement is not warranted, Mr. Komassa seeks damages in an amount to be established at trial.

**COUNT V**
**Promissory Estoppel**
**(Against Defendants Gallagher, Gottschlicht, and Reilly)**

184.     Plaintiff restates the allegations contained in the paragraphs above as if fully set forth herein.

185.     Mr. Komassa was induced to provide valuable services in furtherance of the partnership venture with Messrs. Gallagher and Gottschlicht, and Attorney Reilly based upon their promises that they would be partners in a for-profit management company, which upon information and belief is currently known and operated as GPM II, LLC.

186.     In reliance on these promises, Mr. Komassa conferred a significant value for the partnership through the uncompensated work and strategic ideas that he contributed to the partnership venture.

187.     Messrs. Gallagher and Gottschlicht and Attorney Reilly have received and continue to enjoy the benefit of Mr. Komassa's sweat equity and contribution of strategic ideas, although they have failed to remunerate him for the same.

188.     To the extent that the trier of fact finds that Mr. Komassa did not form a partnership agreement with Messrs. Gallagher and Gottschlicht, and Attorney Reilly, or that specific performance of the partnership agreement is not warranted, Mr. Komassa seeks damages in an amount to be established at trial.

**COUNT VI**
**Unjust Enrichment**
**(Against All Defendants)**

189.     Plaintiff restates the allegations contained in the paragraphs above as if fully set forth herein.

190.    By engaging in the conduct described above, including, among other things, depriving Mr. Komassa of his interest in the partnership ventures and the profits associated with such interest, Defendants enriched themselves to the detriment of Mr. Komassa.

191.    Mr. Komassa invested significant sweat equity in the partnership ventures, including by working in furtherance of the partnership without remuneration, but in reliance on Mr. Gallagher's promise that he would share in the profits of the partnership.

192.    Messrs. Gallagher and Gottschlicht, Attorney Reilly, and I.N.S.A., Inc., have been unjustly enriched by Mr. Komassa's efforts, because but for his willingness to participate in the HCF application, and to provide strategic consultation and other foundational groundwork, I.N.S.A., Inc., likely would not have a license.

193.    Messrs. Gallagher and Gottschlicht, Attorney Reilly, and INSA, LLC, have been unjustly enriched by Mr. Komassa's efforts to launch a cannabis business and apply for a cannabis cultivation and distribution license in Pennsylvania, which was heavily relied upon by the successful license application that INSA, LLC, submitted.

194.    Messrs. Gallagher and Gottschlicht, Attorney Reilly, and Kalyx, have been unjustly enriched by Mr. Komassa's efforts to lay the groundwork for the partnership to pursue additional opportunities in the cannabis industry in Massachusetts, including those that Messrs. Gallagher and Gottschlicht and Attorney Reilly are likely pursuing through Kalyx.

195.    Messrs. Gallagher and Gottschlicht, Attorney Reilly, and GPM II, LLC (or any other management company or investment vehicle operated by Mr. Gallagher, Mr. Gottschlicht, or Attorney Reilly), have been unjustly enriched by Mr. Komassa's leadership in the capital raise, which laid the foundation for financial commitments upwards of $8.5 million.

196.    Upon information and belief, Messrs. Gallagher and Gottschlicht, Attorney Reilly, and GPM II, LLC, have built upon this initial success to close additional investments that were in the pipeline when Mr. Komassa was ousted from the partnership, but which are based on his relationships and foundational work.

197.    Mr. Komassa has not been compensated for any of this work, including his strategic ideas, which have enriched which Mr. Gallagher; Mr. Gottschlicht; Attorney Reilly; GPM II, LLC; I.N.S.A., Inc.; Kalyx; and INSA, LLC.

198.    There is no justification for the enrichment which Mr. Gallagher; Mr. Gottschlicht; Attorney Reilly; GPM II, LLC; I.N.S.A., Inc.; Kalyx; and INSA, LLC, and the corresponding harm to Mr. Komassa.  It is inequitable to allow which Mr. Gallagher; Mr. Gottschlicht; Attorney Reilly; GPM II, LLC; I.N.S.A., Inc.; Kalyx; and INSA, LLC, to retain monies rightfully owed to Mr. Komassa.

199.    As a result of the actions described above, Mr. Komassa has suffered damages in an amount to be established at trial.

**COUNT VII**
**Conversion**
**(Against Defendants Gallagher, Gottschlicht, and Reilly)**

200.    Plaintiff restates the allegations contained in the paragraphs above as if fully set forth herein.

201.    Messrs. Gallagher and Gottschlicht, and Attorney Reilly have converted Mr. Komassa's partnership interest and the financial returns to which he is entitled from the partnership's ventures.

202.    Messrs. Gallagher and Gottschlicht, and Attorney Reilly have exercised ownership and control over Mr. Komassa's partnership interest and the financial returns to which he is entitled from the partnership's ventures, despite having no lawful right to do so.

203.    In addition, Messrs. Gallagher, Gottschlicht, and Attorney Reilly have usurped Mr. Komassa's work-product, including the strategic ideas and work-product that he developed for a capital raise for the entity that is now known and operated as GPM II, LLC, and for the license application that was re-submitted by INSA, LLC.

204.    Messrs. Gallagher and Gottschlicht, and Attorney Reilly have exercised ownership and control over Mr. Komassa's work-product, despite having no lawful right to do so.

205.    As a result of the actions of Messrs. Gallagher and Gottschlicht, and Attorney Reilly, Mr. Komassa has suffered damages in an amount to be established at trial.

### COUNT VIII
### Fraud
### (Against Defendant Gallagher)

206.    Plaintiff restates the allegations contained in the paragraphs above as if fully set forth herein.

207.    Mr. Gallagher intentionally and repeatedly told Mr. Komassa that the two were partners in order to induce Mr. Komassa to undertake work for the partnership and its ventures, including I.N.S.A., Inc.; INSA, LLC; GPM Alpha; GPM II, LLC; among others.

208.    In particular, on or about June 22, 2015, Mr. Gallagher told Mr. Komassa by telephone that if the Massachusetts medical cannabis license were awarded to HCF, Mr. Komassa would be a partner, and hold a minority equity stake, in a management company that they would create.

209.    In an in-person meeting in New York on June 30, 2016, Mr. Gallagher agreed that Mr. Komassa would have a 10% ownership stake of the post-financing equity in a management company to be created, which Mr. Gallagher is now operating as GPM II, LLC.

210.    In early July 2016, Mr. Komassa and Mr. Gallagher agreed to the name of Green Park Management, Inc., as the name of their company, scheduled research trips to California and Colorado, and further developed the details of their investment solicitation, including the equity stakes for the parties involved and a 15% carried interest for the partners.

211.    On July 9, 2016, Mr. Komassa and Mr. Gallagher met on Mr. Gallagher's sailboat in New York, where Mr. Gallagher again affirmed his agreement to Mr. Komassa's equity stake of 10% post-investment (or 12.5% pre-investment).

212.    Mr. Komassa reasonably relied on these repeated representations by Mr. Gallagher by devoting substantial time and effort to contribute sweat equity and strategic ideas to the partnership and its ventures.  In addition, Mr. Komassa invested his reputation, which he put at risk, to help lend credibility to HCF's application for a cannabis license in Massachusetts and to attract investors.

213.    Mr. Komassa's reliance was reasonable, in part because he had previously worked with Mr. Gallagher, and the two shared a relationship of trust.

214.    Mr. Gallagher knew that his representations were false when made, and he made those representations to induce Mr. Komassa to devote his time and effort to the partnership.

215.    As a result, Mr. Komassa has suffered damages in an amount to be established at trial.

## COUNT IX
### Violation of M.G.L. c. 93A Unfair and Deceptive Acts and Practices
### (Against Defendants Gallagher, Gottschlicht, and Reilly)

216.     Plaintiff restates the allegations contained in the paragraphs above as if fully set forth herein.

217.     Mr. Komassa entered into a business relationship with Messrs. Gallagher and Gottschlicht, and Attorney Reilly, as contemplated in M.G.L. c. 93A, §§ 2 and 11.

218.     This relationship arose in the course of trade and commerce, as defined in M.G.L c. 93A, §§ 2, 11.

219.     Mr. Komassa relied on Mr. Gallagher's promise to enter into the business relationship with the intent of meeting his contractual obligations.

220.     He further relied on Mr. Gottschlicht's and Attorney Reilly's assent to the agreement, reflected by their conduct.

221.     The conduct of Messrs. Gallagher and Gottschlicht, and Attorney Reilly has been unfair and deceptive, as well as willful, within the meaning of M.G.L. c. 93A.

222.     Messrs. Gallagher's and Gottschlicht's, and Attorney Reilly's violations of M.G.L. c. 93A occurred primarily and substantially within the Commonwealth of Massachusetts.

223.     To the extent that the trier of fact finds that Mr. Komassa did not form a partnership agreement with Messrs. Gallagher and Gottschlicht, and Attorney Reilly, Messrs. Gallagher's and Gottschlicht's and Attorney Reilly's violations of M.G.L. c. 93A entitle Mr. Komassa to treble the amount of damages Mr. Komassa has sustained by reason of these violations, as well as Mr. Komassa's costs and attorneys' fees.

**COUNT X**
**Declaratory Judgment – Federal Declaratory Judgment Act**
**(Against Defendant Gallagher)**

224.    Plaintiff restates the allegations contained in the paragraphs above as if fully set forth herein.

225.    An actual controversy exists between Mr. Komassa and Mr. Gallagher regarding Mr. Gallagher's intentional deletion of Mr. Komassa's HCF e-mail account, which contained approximately 1,000 e-mails, including e-mails discussing Mr. Komassa's: (i) equity stake in the partnership; (ii) salary expectations; (iii) responsibilities, tasks, and goals; (iv) strategy and guidance for hiring, capital raising, branding, expansion, marketing, technology, retail, product development, and other areas of business; (v) leadership of the capital raise and guidance to Mr. Gallagher regarding fundraising; (vi) marketing materials and other corporate records; (vii) negotiations with third-parties; and (viii) other evidence of Mr. Komassa's sweat equity.

226.    Mr. Gallagher deleted this e-mail account after he was aware of a dispute with Mr. Komassa, because it was done at or shortly after the time that he ousted Mr. Komassa from the partnership.

227.    Upon information and belief, the e-mail account and its contents are irretrievable.

228.    Under the Federal Declaratory Judgment Act, this Court has jurisdiction to enter a declaratory judgment in this matter declaring the rights and obligations of the parties as requested.

229.    As a result of this intentional spoliation of evidence, which may be irretrievable and unavailable from alternative sources, Mr. Gallagher should be estopped from denying his partnership with Mr. Komassa.

230.    Mr. Komassa also seeks declaratory judgment regarding all other remedies to which he is entitled under the Federal Declaratory Judgment Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Peter Komassa prays that this Court grant him the following relief:

1. That judgment is entered for Plaintiff on all Counts in his Complaint.

2. That Plaintiff is awarded injunctive relief, damages, punitive damages, and multiple damages, where applicable.

3. That Plaintiff is granted declaratory judgment.

4. That the Court enter judgment against Defendants in an amount to be determined at trial, and that such amount comprise treble damages in accordance with M.G.L. c. 93A, plus interest, costs and attorneys' fees.

5. That the Court grant Plaintiff statutory prejudgment interest, and such interest accruing from the time of relevant breaches.

6. That the Court grant Plaintiff such other and further relief as it considers just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims so triable.

Respectfully Submitted,

**PETER KOMASSA**

By his attorneys,


By:  /s/ Colin R. Hagan
Colin R. Hagan, BBO No. 684798
David J. Shlansky, BBO No. 565321
SHLANSKY LAW GROUP, LLP
1 Winnisimmet St.
Chelsea, MA 02150
Phone: (617) 497-7200
Fax:    (866) 257-9530
E-mail: Colin.Hagan@slglawfirm.com
            David.Shlansky@slglawfirm.com

Dated: January 5, 2022

# **EXHIBIT A**

Membership of Defendant LLCs

*Please see attached.*

| Defendant LLC | Members/State of Citizenship |
|---|---|
| Kalyx, LLC | • Steve, a natural person who is a citizen of Massachusetts;<br>• Nicole, a natural person who is a citizen of Massachusetts;<br>• Alexa, a natural person who is a citizen of Massachusetts. |
| INSA, LLC | • The sole member of INSA, LLC, is GPM II, LLC. |
| GPM II, LLC | <u>Natural Persons</u><br>• Alfred, a natural person who is a citizen of Massachusetts;<br>• Andrew, a natural person who is a citizen of Massachusetts;<br>• Arnold, a natural person who is a citizen of Massachusetts;<br>• Charles, a natural person who is a citizen of Massachusetts;<br>• Christopher, a natural person who is a citizen of Massachusetts;<br>• Craig, a natural person who is a citizen of Massachusetts;<br>• Dawn, a natural person who is a citizen of Massachusetts;<br>• Donald, a natural person who is a citizen of Massachusetts;<br>• Donald, a natural person who is a citizen of New York;<br>• Edward, a natural person who is a citizen of New York;<br>• Gerald, a natural person who is a citizen of Massachusetts;<br>• Hakan, a citizen of Sweden and who is not a citizen of the United States;<br>• James, a natural person who is a citizen of Massachusetts;<br>• Jane, a natural person who is a citizen of Massachusetts;<br>• Jennings, a natural person who is a citizen of Maine;<br>• Ken, a natural person who is a citizen of Massachusetts;<br>• Kevin, a natural person who is a citizen of New York; |

| Defendant LLC | Members/State of Citizenship |
|---|---|
| GPM II, LLC (Cont'd) | • Lewis, a natural person who is a citizen of New York; <br><br> • Lisa, a natural person who is a citizen of New York; <br><br> • Mark, a natural person who is a citizen of Massachusetts; <br><br> • Rick, a natural person who is a citizen of Massachusetts; <br><br> • Robert, a natural person who is a citizen of Massachusetts; <br><br> • Runar, a natural person who is a citizen of Norway and who is not a citizen of the United States; <br><br> • Schuyler, a natural person who is a citizen of Massachusetts; <br><br> • Steve, a natural person who is a citizen of Massachusetts; <br><br> • Thompson, a natural person who is a citizen of Florida; <br><br> • Todd, a natural person who is a citizen of Massachusetts; <br><br> • Tom, a natural person who is a citizen of Connecticut; <br><br> • Tristan, a natural person who is a citizen of Massachusetts; <br><br> • Wayne, a natural person who is a citizen of New York; <br><br> • Winston, a natural person who is a citizen of New Jersey; and <br><br> • Zane, a natural person who is a citizen of Florida. <br><br> LLCs and Trusts <br><br> • The Dean Family 2015 Trust: Trustees are Hume, a natural person who is a citizen of New York, and Thompson, a natural person who is a citizen of Florida; <br><br> • Hyslip Family Investments, LLC: members are natural people who are citizens of Massachusetts. Through investigation, Mr. Komassa's counsel was unable to obtain the identities of the members of Hyslip Family |

| Defendant LLC | Members/State of Citizenship |
|---|---|
| GPM II, LLC (Cont'd) | Investments, LLC, but its Manager represented that all such members are natural people and citizens of Massachusetts;<br><br>• Rockport New Name Investments TR: Trustee is Alfred, a natural person who is a citizen of Massachusetts;<br><br>• David H. Weener 2011 Trust: Trustee is David, a natural person who is a citizen of Florida;<br><br>• E. Denis Walsh Revocable Trust: Trustees are Lucas, Eugenie, and Gregory, each of whom is a natural person and a citizen of Massachusetts;<br><br>• Jade Capital, LLC: Members are are natural people who are citizens of Massachusetts.  Through investigation, Mr. Komassa's counsel was unable to obtain the identities of the members of Jade Capital, LLC, but its counsel represented that all such members are natural people and citizens of Massachusetts;<br><br>• PB& J Ventures, LLC: Members are: (a) Bobby, a natural person who is a citizen of Massachusetts; (b) Jeffrey, a natural person who is a citizen of Massachusetts; (c) Peter, a natural person who is a citizen of Massachusetts; and (d) Bobby, a natural person who is a citizen of Colorado; and<br><br>• GPM Investment, LLC: Members are Peter and Patrick, each of whom is a natural person and a citizen of Massachusetts. |

## <u>CERTIFICATE OF SERVICE</u>

I, Colin R. Hagan, hereby certify that on January 5, 2022, the foregoing Amended Supplemental Civil Complaint will be served on all counsel of record via CM/ECF.

/s/ Colin R. Hagan
Colin R. Hagan